[Cite as *In re A.D.M.*, 2017-Ohio-1432.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HIGHLAND COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | Case No. 16CA25 |
| | : | |
| A.D.M. | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| Alleged Dependent Child | : | |
| | : | **Released: 04/11/17** |

APPEARANCES:

Lynn Turner, Hillsboro, Ohio, for Appellant.

Anneka P. Collins, Highland County Prosecutor, and James Roeder, Highland County Assistant Prosecutor, Hillsboro, Ohio, for Appellee.

McFarland, J.

Appellant, B.V., appeals the trial court's judgment that awarded permanent custody of her fourteen-month-old biological child, A.D.M., to Appellee, Highland County Department of Job and Family Services (HCJFS).[1] Appellant first essentially argues that the trial court's best interest determination is against the manifest weight of the evidence. She contends that the court did not adequately weigh her efforts to complete the case plan. We do not agree. The record contains ample clear and convincing evidence to support the trial court's best interest finding, and the trial court was not required to find Appellant's case plan compliance

dispositive or to afford it any greater weight than other relevant factors. Furthermore, the trial court specifically noted Appellant's efforts in its decision. The record thus belies Appellant's claim that the trial court did not "recognize" her efforts.

Appellant next asserts that the trial court erred by granting permanent custody to Appellee when Appellee failed to timely file an amended case plan outlining the adoption plans. We again disagree with Appellant. The permanent custody statutes do not require children services agencies to file updated adoption case plans before a trial court can grant an agency's permanent custody motion. Therefore, we overrule Appellant's two assignments of error and affirm the trial court's judgment.

## I. FACTS

On September 28, 2015, Appellee sought emergency custody of twenty-four-day-old A.D.M. Appellee also filed an abuse, neglect, and dependency complaint concerning A.D.M. that requested temporary custody of A.D.M. The complaint alleged that (1) at the time of A.D.M.'s birth, Appellant tested positive for cocaine, methamphetamine, opiates, and ecstasy, and A.D.M. exhibited signs of withdrawal; and (2) Appellant left the hospital the day after A.D.M.'s birth, without being medically released.

---

[1] A.D.M.'s biological father is unknown.

At a November 10, 2015 hearing, Appellant admitted dependency and agreed to place A.D.M. in Appellee's temporary custody for one year. On December 2, 2015, the trial court adjudicated A.D.M. dependent and dismissed the abuse and neglect allegations. The trial court placed A.D.M. in Appellee's temporary custody for a one-year period.

On August 15, 2016, Appellee filed a motion that requested the trial court to grant it permanent custody of A.D.M. Appellee alleged that Appellant abandoned A.D.M. and that placing A.D.M. in its permanent custody is in A.D.M.'s best interest.

On October 7, 2016, the court held a hearing to consider Appellee's permanent custody motion. HCJFS caseworker Jamie Miller testified that A.D.M. had been in Appellee's temporary custody since shortly after birth and had lived in the same foster home throughout that time. Miller stated that A.D.M. was "doing very well" in the foster home, was "bonded" with the foster family, and "seems very happy." Miller explained that A.D.M. "reaches for [the foster parents and] fits right in."

Miller related that Appellant did not have any contact with A.D.M. between August 2015 and February 2016. Miller explained that in February 2016, Appellant attended a doctor's appointment with A.D.M., but since then, Appellant had not had any contact with A.D.M.

Miller additionally stated that Appellant had not complied with the case plan. Miller related that the case plan required Appellant to (1) complete a drug and alcohol assessment and follow any recommendations, (2) submit to random drug screens, (3) comply with probation, and (4) maintain a safe house and legal income. Miller testified that in January 2016, Appellant completed a drug and alcohol assessment but she was released shortly thereafter due to medical concerns. Miller explained that Appellant restarted the program in February 2016, but in March 2016, "she was pink-slipped for suicidal thoughts." Miller indicated that in August 2015, Appellant had a positive drug screen, and the rest were negative.

Miller explained that in November 2015, Appellant was convicted of possession of heroin, attempt to commit grand theft of a firearm, and failure to appear. The trial court sentenced Appellant to two years of community control, but the trial court later revoked Appellant's community control and sentenced her to serve twelve months in prison. Miller stated that Appellant's expected release date was in January 2017.

On cross-examination, Appellant's counsel asked Miller why Appellee sought permanent custody when Appellant would be released from prison approximately eight months before the statutory two-year period

expired.[2]  Miller stated that it was "in the best interest of the child to provide a legally secure placement."  Miller agreed that the foster home was a legally secure placement, but explained that Appellee found Appellant's past behavior concerning.

A.D.M.'s foster mother testified that A.D.M. had lived in her home since shortly after birth.  The foster mother explained that A.D.M. was integrated into her home and had positive interactions in the home.  She additionally stated that she and her husband would adopt A.D.M. if Appellee was granted permanent custody.

Appellant testified and admitted that she previously was convicted of possession of heroin, attempted theft of a firearm, and failure to appear.  Appellant explained that she was residing in the medical center at the Ohio Reformatory for Women because she was due to give birth on December 8, 2016.  Appellant stated that she had resided at the medical center since May

[2] R.C. 2151.353(G) states that a trial "court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered."  Additionally, R.C. 2151.415(D)(4) states:  "No court shall grant an agency more than two extensions of temporary custody pursuant to division (D) of this section and the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section." *Accord State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Common Pleas Court, Prob. Div.*, --- Ohio St.3d ---, 2016-Ohio-7382, --- N.E.3d ---, ¶ 23, citing R.C. 2151.415(D)(4) (stating that "temporary custody cannot extend beyond two years").

25, 2016 and had been attending AA twice per week, NA once per week, and church every other Thursday for bible study.  Appellant further indicated that she was taking parenting classes, was receiving mental health counseling, and was taking medication for depression.

Appellant testified that she would be released from prison in January 2017 and that following her release she hoped to live in a half-way house for four to six months where she could seek help obtaining employment and a home.  Appellant indicated that she wanted custody of A.D.M. and believed that she would be able to fully comply with the case plan upon her release from prison.

Appellant agreed that she did not visit with A.D.M. from August 15, 2015 through the February 2016 medical appointment and that she had not seen the child since the February 2016 medical appointment.  She further conceded that she had not sent any cards or letters to A.D.M. or otherwise attempted to communicate with A.D.M.  Appellant claimed, however, that she had difficulty contacting the caseworker and that she was not familiar with the process.  Appellant additionally explained that she did not see th A.D.M. between August 2015 and February 2016, partly because she was incarcerated (between October and February), and partly because she did not have transportation.

At the conclusion of the hearing, the trial court judge stated the

following to Appellant:

"It's very concerning to the court that this I'm sure beautiful fourteen month old child * * * was born to a mother who has admitted in this court that cocaine, methamphetamine, opiates [were] in her system when this child was born; therefore, you were using that stuff when you were carrying this child. * * * That type of irresponsible, self-centered behavior * * * is extremely concerning to the Court.

* * *

More acts of irresponsibility as far as this court is concerned, you get into more criminal trouble, you didn't show up to court, and you find yourself in prison. Instead of working a case plan and doing what you could at the beginning of this case, it could be over with, this child could be back in your care. But again, bad decisions.

* * **

* * * So it's very easy to sit up here or over there and say you're going to do the right thing, but as I often times say in here, I see a whole lot better than I hear. And I can see what your behavior has been here. And this child deserves a future brighter than apparently you can give her at this point.

Have you done a few right things the last few months? You didn't really have many other options, did you, while you were locked up. So * * * I hope for the sake of the child you're carrying now that you have learned a lesson. I'm sure if I ask you you're going to tell me, I'm more interested in what you do after you are finally released.

* * *

* * * [W]hat you've done over the last 14 months is some indication, maybe not total, but some indication of what you'll do over the next several. And frankly, I agree with the Guardian ad Litem here, * * * based upon what I've heard and seen here and past experience * * * what's best for this child frankly it's hard for me to side with you to

give you a chance here when you're shown really nothing to this court that that's what's best for this child."

On October 11, 2016, the trial court filed an "Entry Terminating Parental Rights." The court found that the mother abandoned A.D.M. and that awarding Appellee permanent custody would serve A.D.M.'s best interest. In considering A.D.M.'s best interest, the court noted the following: (1) Appellant "elected not to have any meaningful interaction or interrelationship with her daughter"; (2) A.D.M. had lived with the same foster family since birth and was fully integrated into the foster home; (3) the foster parents were willing to adopt A.D.M.; (4) the guardian ad litem recommended that the court grant permanent custody; (5) Appellant would be incarcerated until January 2017, when she hoped to be released to a halfway house; (6) Appellant likely would remain in the halfway house for four to six months; and (7) Appellant admitted that she tested positive for cocaine, methamphetamine, opiates, and ecstasy at the time of A.D.M.'s birth.

The court additionally found that Appellant was unable to provide a legally secure permanent placement for A.D.M. The court did not believe that Appellant "is willing or able in the foreseeable future to parent [the child]." The court recognized that Appellant "has complied with parts of her case plan," but determined that her "minimal efforts" did "not override"

A.D.M.'s best interest. The court explained: "This is yet another case in a seemingly unending string of cases where a parent has chosen her drug or drugs of choice over being a parent. This Court will not experiment with [the child]'s welfare * * * by denying the permanent custody motion." The court thus determined that placing A.D.M. in Appellee's permanent custody was in A.D.M.'s best interest.

## II. ASSIGNMENTS OF ERROR

Appellant raises two assignments of error:

"The trial court erred in failing to recognize the positive efforts made by the mother to complete her case plan, thus skewing its best interest analysis."

"The trial court erred in granting permanent custody to the agency which failed to file a timely amended case plan outlining permanency/adoption goals."

## III. FIRST ASSIGNMENT OF ERROR

In her first assignment of error, Appellant essentially argues that the trial court's best interest finding is against the manifest weight of the evidence. Specifically, she asserts that the trial court failed to adequately consider her efforts to comply with the case plan when it evaluated A.D.M.'s best interest.

## A. STANDARD OF REVIEW

A reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *In re B.E.,* 4th Dist. Highland No. 13CA26, 2014-Ohio-3178, ¶ 27; *In re R.S.,* 4th Dist. Highland No. 13CA22, 2013-Ohio-5569, ¶ 29.

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' " *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12; quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed.1990).

When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court " ' "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." ' " *Eastley* at ¶ 20; quoting *Tewarson v. Simon,* 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001); quoting *Thompkins* at 387; quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *Accord In re Pittman,* 9th Dist. Summit No. 20894, 2002-Ohio-2208, ¶ 23-24.

The question that we must resolve when reviewing a permanent custody decision under the manifest weight of the evidence standard is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.,* 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43.  "Clear and convincing evidence" means:

> "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established.  It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases.  It does not mean clear and unequivocal." *In re Estate of Haynes,* 25 Ohio St.3d 101, 103-04, 495 N.E.2d 23 (1986).

In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel,* 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). *Accord In re Holcomb,* 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985); citing *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof."); *In re Adoption of Lay,* 25 Ohio St.3d 41, 4243, 495 N.E.2d 9 (1986). *Cf. In re Adoption of Masa,* 23 Ohio St.3d 163, 165, 492

N.E.2d 140 (1986) (stating that whether a fact has been "proven by clear and convincing evidence in a particular case is a determination for the [trial] court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence"). Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence. *In re R.M.,* 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013-Ohio-3588, ¶ 62; *In re R.L.,* 2nd Dist. Greene Nos. 2012CA32 and 2012CA33, 2012-Ohio-6049, ¶ 17; quoting *In re A.U.,* 2nd Dist. Montgomery No. 22287, 2008-Ohio-187, ¶ 9 ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.' "). Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears that the fact-finder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin,* 20 Ohio

App.3d at 175.  A reviewing court should find a trial court's permanent

custody decision against the manifest weight of the evidence only in the "

'exceptional case in which the evidence weighs heavily against the

[decision].' " *Id.; accord State v. Lindsey,* 87 Ohio St.3d 479, 483, 721

N.E.2d 995 (2000).

Furthermore, when reviewing evidence under the manifest weight of

the evidence standard, an appellate court generally must defer to the fact-

finder's credibility determinations. *Eastley* at ¶ 21.  As the *Eastley* court

explained:

> " '[I]n determining whether the judgment below is manifestly against
> the weight of the evidence, every reasonable intendment must be
> made in favor of the judgment and the finding of facts. * * * If the
> evidence is susceptible of more than one construction, the reviewing
> court is bound to give it that interpretation which is consistent with the
> verdict and judgment, most favorable to sustaining the verdict and
> judgment.' " *Id.;* quoting *Seasons Coal Co., Inc. v. Cleveland,* 10
> Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn.3, quoting 5 Ohio
> Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978).

Deferring to the trial court on matters of credibility is "crucial in a

child custody case, where there may be much evident in the parties'

demeanor and attitude that does not translate to the record well." *Davis v.*

*Flickinger,* 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).  *Accord In re*

*Christian,* 4th Dist. Athens No. 04CA10, 2004-Ohio-3146, ¶ 7.  As the Ohio

Supreme Court long-ago explained:

"In proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation cannot be conveyed to a reviewing court by printed record." *Trickey v. Trickey,* 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952).

Furthermore, unlike an ordinary civil proceeding in which a jury has no contact with the parties before a trial, in a permanent custody case a trial court judge may have significant contact with the parties before a permanent custody motion is even filed. In such a situation, it is not unreasonable to presume that the trial court judge had far more opportunities to evaluate the credibility, demeanor, attitude, etc., of the parties than this Court ever could from a mere reading of the permanent custody hearing transcript.

## B. PERMANENT CUSTODY PRINCIPLES

A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388 (1982); *In re Murray,* 52 Ohio St.3d 155, 156, 556 N.E.2d 1169 (1990); *accord In re D.A.,* 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829. A parent's rights, however, are not absolute. *D.A.* at ¶ 11. Rather, " 'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the pole star or controlling principle to be observed.' " *In re Cunningham,* 59 Ohio St.2d 100, 106, 391 N.E.2d

1034 (1979); quoting *In re R.J.C.,* 300 So.2d 54, 58 (Fla.App.1974).  Thus,

the state may terminate parental rights when a child's best interest demands

such termination. *D.A.* at ¶ 11.

Before a court may award a children services agency permanent

custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing.

The primary purpose of the hearing is to allow the court to determine

whether the child's best interests would be served by permanently

terminating the parental relationship and by awarding permanent custody to

the agency. R.C. 2151.414(A)(1).  Additionally, when considering whether

to grant a children services agency permanent custody, a trial court should

consider the underlying principles of R.C. Chapter 2151:

> (A) To provide for the care, protection, and mental and physical
> development of children * * *;
> * * *
> (B) To achieve the foregoing purpose[], whenever possible, in a
> family environment, separating the child from its parents only when
> necessary for his welfare or in the interests of public safety.

### C. PERMANENT CUSTODY FRAMEWORK

R.C. 2151.414(B)(1) permits a trial court to grant permanent custody

of a child to a children services agency if the court determines, by clear and

convincing evidence, that the child's best interest would be served by the

award of permanent custody and that:

(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

Thus, before a trial court may award a children services agency permanent custody, it must find (1) that one of the circumstances described in R.C. 2151.414(B)(1) applies, and (2) that awarding the children services agency permanent custody would further the child's best interests. Here, the trial court found that A.D.M. was abandoned within the meaning of R.C. 2151.414(B)(1)(b). Neither of Appellant's assignments of error challenges the court's R.C. 2151.414(B)(1)(b) finding. We therefore do not address this issue.

## D. BEST INTEREST

R.C. 2151.414(D) requires a trial court to consider specific factors to determine whether a child's best interest will be served by granting a

children services agency permanent custody. The factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply. R.C. 2151.414(E)(7) to (11) states:

> (7) The parent has been convicted of or pleaded guilty to one of the following:
>
> (a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
>
> (b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
>
> (c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense

described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;

(d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

(e) An offense under section 2905.32, 2907.21, or 2907.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

(f) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a), (d), or (e) of this section.

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section

2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors." *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57, citing *In re Schaefer,* 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56; *accord In re C.G.,* 9th Dist. Summit Nos. 24097 and 24099, 2008-Ohio-3773, ¶ 28; *In re N.W.*, 10th Dist. Franklin Nos. 07AP-590 and 07AP-591, 2008-Ohio-297, 2008 WL 224356, ¶ 19. However, none of the best interest factors requires a court to give it "greater weight or heightened significance." *C.F.* at ¶ 57.

In the case at bar, we do not believe that the trial court's best interest determination is against the manifest weight of the evidence. The record contains ample competent and credible evidence that allowed the trial court to form a firm belief that permanent custody is in A.D.M.'s best interest.

1.  Child's Interactions and Interrelationships

Appellee presented evidence that since A.D.M.'s August 2015 birth, Appellant has seen A.D.M. only one time—in February 2016 for a medical appointment.  Appellant did not maintain any type of communication with A.D.M.  Thus, Appellant's interaction with A.D.M. has been extremely limited and she could not possibly have forged any type of a bond with her fourteen-month-old child.  In contrast, A.D.M. has consistently lived in the same foster home since her release from the hospital and shares a bond with the foster family.

## 2.  Child's Wishes

At the time of the permanent custody hearing, A.D.M. was approximately fourteen-months-old.  A.D.M. thus did not directly share her wishes.  A.D.M.'s guardian ad litem recommended that the trial court grant Appellee permanent custody.

## 3.  Custodial History

A.D.M. has been in Appellee's temporary custody since shortly after birth.  Since that time, A.D.M. has remained in the same foster home.  A.D.M. has never lived with Appellant.

## 4.  Legally Secure Permanent Placement

At the time of the permanent custody hearing, Appellant was incarcerated and thus unable to provide A.D.M. with a legally secure

permanent placement.  Appellant asserted that she would be released from

prison in January 2017, at which point she hoped to live in a half-way house

for four to six months.  Appellant claimed that after her release from prison,

she would demonstrate that she would be willing and able to provide A.D.M.

with a legally secure permanent placement.  However, the trial court found

her claim specious and instead determined that her past conduct, rather than

her promises for the future, was a better predictor of her future conduct.  The

unfortunate truth, as the trial court noted, is that Appellant elevated her self-

interest in substance abuse over the health and safety of her child.  The trial

court was not required to keep the young child in limbo or to experiment

with her welfare in order to see whether Appellant would refrain from

substance abuse and maintain safe and stable housing upon her release from

prison.  We cannot fault the trial court for deciding not to experiment with

the child's welfare—especially at such a young age—by continuing her in

Appellee's temporary custody indefinitely while Appellant attempts to

resolve her issues.  "A child's best interest is served by placing the child in a

permanent situation that fosters growth, stability, and security." *In re C.B.C.*,

4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, 2016 WL

915012, ¶ 66, citing *In re Adoption of Ridenour,* 61 Ohio St.3d 319, 324,

574 N.E.2d 1055 (1991).  The trial court could have determined that the

possibility that Appellant would remain drug-free upon her release was too remote and that continuing the child in a temporary custody situation would not foster the child's growth, stability, and security, but instead, would hinder it. Therefore, we do not believe that the trial court was required to continue the child in Appellee's temporary custody indefinitely in order to see whether Appellant's conduct upon her release from prison would show that she is fully committed to providing A.D.M.with an adequate permanent home. *See e.g., In re C.S.*, 4th Dist. Athens No. 2015-Ohio-4883, 2015 WL 7569022, ¶ 39; *In re M.M.,* 4th Dist. Meigs No. 14CA6, 2014-Ohio-5111, ¶ 33; *In re C.T.L.A.,* 4th Dist. Hocking No. 13CA24, 2014-Ohio-1550, ¶ 1.

As this court frequently recognizes:

" '* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm.' " *In re H.W.*, 4th Dist. Ross No. 16CA3565, 2016-Ohio-7794, ¶ 24, quoting *In re Bishop,* 36 Ohio App.3d 123, 126, 521 N.E.2d 838 (5th Dist.1987), quoting *In re East,* 32 Ohio Misc. 65, 69, 288 N.E.2d 343 (1972).

In sum, A.D.M. needs a legally secure permanent placement and cannot achieve this type of placement without granting Appellee permanent custody. Even though A.D.M.'s current foster home may be a legally secure

placement, it is not a legally secure *permanent* placement until A.D.M. is placed in the home on a permanent basis, instead of under a temporary custody arrangement.

### 5.  R.C. 2151.414(E)(7)-(11)

The trial court found that Appellant abandoned A.D.M.  Thus, R.C. 2151.414(E)(10) applies.  For purposes of R.C. Chapter 2151, "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." R.C. 2151.011(C).  The evidence in the case at bar shows that Appellant had only one contact—a visit during a medical appointment— with A.D.M. between August 2015 and October 2016.  The record thus supports a finding that Appellant failed to visit or maintain contact with A.D.M. for more than ninety days and that she therefore abandoned A.D.M.

### 6.  OTHER RELEVANT FACTORS

#### a.  Case Plan Compliance

Appellant asserts that the progress she made to address her substance abuse issues militates against granting Appellee permanent custody.  While we commend Appellant for the progress she made while imprisoned, she did not show any effort to address her substance abuse issues when she was not

in prison. As the trial court observed, Appellant had little choice but to address her substance abuse issues during imprisonment. Moreover, although we do not discount Appellant's efforts, her compliance with the case plan requirements does not override what is in A.D.M.'s best interest. Once the court finds the existence of one of the R.C. 2151.414(B)(1) factors, the child's best interest controls. *D.A., supra,* 2007-Ohio-1105, ¶ 11 ("Once the case reaches the disposition phase, the best interest of the child controls."); *In re K.J.,* 4th Dist. Athens No. 08CA14, 2008-Ohio-5227, ¶ 24 (stating that "when considering a R.C. 2151.414(D)(1)(d) permanent custody motion, the focus is upon the child's best interests, not upon the parent's compliance with the case plan"). A parent's case plan compliance may be relevant to the extent that it affects the child's best interest. *E.g.*, *In re T.J.*, 4th Dist. Highland No. 2016-Ohio-163, 2016 WL 228187, ¶ 36, citing *In re R.L.,* 9th Dist. Summit Nos. 27214 and 27233, 2014-Ohio-3117, ¶ 34 (stating that "although case plan compliance may be relevant to a trial court's best interest determination, it is not dispositive of it"). However, a parent's case plan compliance does not preclude a trial court from awarding permanent custody to a children services agency when doing so is in the child's best interest. *Id.*, citing *In re N.L.,* 9th Dist. Summit No. 27784, 2015-Ohio-4165, ¶ 35 (stating that "substantial compliance with a case plan,

in and of itself, does not establish that a grant of permanent custody to an agency is erroneous"); *In re S.C.,* 8th Dist. Cuyahoga No. 102349, 2015-Ohio-2280, ¶ 40 ("Compliance with a case plan is not, in and of itself, dispositive of the issue of reunification."); *In re W.C.J.,* 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, ¶ 46 ("Substantial compliance with a case plan is not necessarily dispositive on the issue of reunification and does not preclude a grant of permanent custody to a children's services agency."). Thus, Appellant's actions may be relevant to the extent that they impact A.D.M.'s best interest, but they do not alone show that denying Appellee permanent custody in order to afford Appellant additional time to comply with the case plan is in A.D.M.'s best interest. *See, e.g., In re K.C.,* 9th Dist. Summit Nos. 26992, 26993, 2014-Ohio-372, ¶22; *In re B.G.,* 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 21; *In re Cornell,* 11th Dist. Portage No. 2003-Ohio-5007, 2003 WL 22171435, ¶ 28 (rejecting mother's argument that trial court should afford mother additional time to complete case plan goals and noting that "a permanent custody hearing must be grounded upon the child's best interests.").

Moreover, to the extent Appellant believes that the trial court did not "recognize" her efforts, the record disproves Appellant's belief. The trial

court explicitly noted Appellant's efforts but determined that her efforts did

not supersede A.D.M.'s best interest.

### b.  Incarceration As Excuse

Appellant asserts that the trial court failed to consider that her

incarceration provided a valid reason for her lack of contact with A.D.M.  In

*In re C.B.*, 4th Dist. Highland No. 16CA22, 2016-Ohio-8293, 2016 WL

7496587, we rejected a parent's argument that incarceration necessarily

constitutes a valid excuse for lack of communication with a child so as to

refute an abandonment finding.  We explained:

> "Precedent supports application of the presumption of abandonment to
> incarcerated parents who do not visit or contact their child for the 90-
> day period * * *. *See In re S.B.,* 2009-Ohio-3619, 916 N.E.2d 1110,
> ¶ 33-35 (10th Dist.), citing *In re Wright,* 5th Dist. Stark No.
> 2003CA00347, 2004-Ohio-1094, ¶ 19-20.  Moreover, although the
> agency may have prevented [the parent] from physically visiting the
> child while he was in prison, there was no evidence that it prevented
> him from contacting his son in other ways, e.g., by telephone or mail.
> In fact, he admitted that the agency instructed him on how to contact
> his son in this manner, but he ultimately declined to do so.  Under
> comparable circumstances, appellate courts have upheld awards of
> permanent custody based on abandonment. *See In re A.W.,* 9th Dist.
> Lorain No. 08CA00936, 2009-Ohio-1827, ¶ 7 ("Although Father was
> incarcerated for half of [a] year, he could have attempted to contact
> A.W. through letters or telephone calls, * * * but he did not"); *In re
> C.C.,* 12th Dist. Warren Nos. CA2011–11–113 and CA2011–11–127,
> 2012-Ohio-1291, ¶ 18 ("Although the parents were unable to visit the
> children because visitations were suspended, there was no testimony
> that they were in any way prevented from maintaining contact with
> the children through other means, such a telephone calls, letters or
> cards"). *Id.* at ¶ 23-24.

We thus reject Appellant's assertion that her incarceration justified her failure to communicate with A.D.M.

Based upon a consideration of the foregoing evidence, the trier of fact reasonably could have formed a firm belief that permanent custody is in A.D.M.'s best interest. Even if this court may have balanced the best interest factors differently, we cannot disregard the trial court's unique position to evaluate the parties' relative situations and the genuineness of a parent's claim that the parent will try harder, if given the opportunity. We cannot consider the factors in a vacuum, but instead, must consider the factors in light of the credibility of the witnesses who testified during the permanent custody. Thus, even if we were to conclude that it seems objectively reasonable to afford Appellant time upon her release to demonstrate her willingness or ability to provide a legally secure permanent placement for A.D.M., we did not view Appellant's demeanor or attitude and simply cannot second-guess the trial court's determination that Appellant appears unlikely to be able to follow through. Instead, we must defer credibility matters "to those 'who see and hear what goes on in the courtroom.' " *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 59, quoting *State v. Cowans,* 87 Ohio St.3d 68, 84, 717 N.E.2d 298 (1999). Upon consideration of the totality of the factors, and

recalling that the trial court's judgment may rest upon witness demeanor and nuances that do not translate to the written record, we are unable to find that the trial court's best interest determination is against the manifest weight of the evidence.

Accordingly, based upon the foregoing reasons, we overrule Appellant's first assignment of error.

### IV. SECOND ASSIGNMENT OF ERROR

In her second assignment of error, Appellant argues that the trial court erred as a matter of law by granting Appellee permanent custody before Appellee filed a case plan outlining the adoption plans.

The Ohio Supreme Court has explicitly rejected the argument that a children services agency seeking permanent custody of a child must update the child's case plan to include adoption plans before the court may grant the agency permanent custody of the child. *In re T.R.,* 120 Ohio St.3d 136, 2008-Ohio-5219, 896 N.E.2d 1003, ¶ 17.  The court held that although R.C. 2151.413(E) "requires a children-services agency seeking permanent custody of a child to update the child's case plan to include adoption plans," the statute "does not require the agency to perform this action before the

juvenile court rules on the motion for permanent custody."[3] *Id.*; *accord In re J.G.*, 9th Dist. Wayne No. 14CA0004, 2014-Ohio-2570, 2014 WL 2700962, ¶¶ 7-8; *In re N.H.,* 9th Dist. Summit No. 24355, 2008–Ohio–6617, ¶ 8. Based upon the clear holding in *T.R.*, we disagree with Appellant that the trial court erred by granting Appellee permanent custody before Appellee filed a case plan outlining the adoption plans.

Accordingly, based upon the foregoing reasons, we overrule Appellant's second assignment of error and affirm the trial court's judgment.

**JUDGMENT AFFIRMED.**

---

[3] R.C. 2151.413(E) provides: "Any agency that files a motion for permanent custody under this section shall include in the case plan of the child who is the subject of the motion, a specific plan of the agency's

# JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Highland County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

For the Court,

BY: _____
Matthew W. McFarland, Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**

actions to seek an adoptive family for the child and to prepare the child for adoption."